IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

WILSON LEE CLOW, JR.,

        Defendant.

Case No. 6:12-cr-00638-AA
OPINION AND ORDER

AIKEN, District Judge:

    Defendant is charged by indictment with selling firearms to prohibited persons and making a false statement during the sale of a firearm. The charges stem from Defendant's alleged illegal sale of firearms to an informant, a person convicted of a violent felony; assisting the informant in falsifying Alcohol, Tobacco and Firearm (ATF) Form 4473; and making false statements in Federal Firearms License's (FFL) Acquisition and Disposition (A & D) Books.

    Defendant moves to suppress statements made as a result of an interview with ATF agents at his residence in Grants Pass, Oregon on August 22, 2012. The government does not intend to use

1    - OPINION AND ORDER

Defendant's statements in its case-in-chief. Instead, the government intends to use Defendant's August 22, 2012 statements to impeach him at trial should he choose to testify or otherwise present evidence arguably inconsistent with those statements. On February 26, 2016, the court heard argument and the testimony of several witnesses, including Defendant. Defendant's motion is denied.

## BACKGROUND

On August 21, 2012, ATF Agent Caleb Enk obtained a search warrant to search and seize items at the premises of 2nd Amendment Guns, LLC, and buildings located at 2701 Coed Place in Grants Pass, Oregon. Defendant and his wife, Lynne Clow, owned and operated 2nd Amendment Guns, a federal firearms licensee, which is operated out of a building located adjacent to Defendant's residence.[1]

On August 22, 2012, seventeen federal agents and officers met in Grants Pass to execute the search warrant. At approximately 9:35 a.m., Agent Enk called 2nd Amendment Guns in an undercover capacity and informed Defendant that he would be stopping by the gun store with some friends. Defendant, believing that he was talking to potential customers, invited Agent Enk and his friends over to the shop. At approximately 9:50 a.m., Agent Enk, ATF Agent Aaron Woods, and ATF Agent Kenneth Cooper arrived at 2701 Coed Place, to contact Defendant and detain him for officer safety purposes. The three agents arrived in an unmarked red Ford Expedition, parked in the driveway next to the gun shop, and observed Defendant standing outside in the driveway. The agents were wearing plain clothes and carrying concealed handguns. Defendant greeted the agents and led them inside the 2nd Amendment Guns facility.

---

[1] Defendant claims that his wife owns the business and he is simply a manager and "consultant."

2       - OPINION AND ORDER

After entering the gun shop, Agent Enk displayed his badge and identified himself as an ATF Agent. Thereafter, Agent Enk explained that he had a federal search warrant for Defendant's business and residence. Agent Enk then handcuffed and searched Defendant. Meanwhile, Agent Enk explained to Defendant that he was not under arrest, but he was being detained for officers' safety until the agents could secure the business and residence. Defendant stated that he understood and was willing to cooperate in whatever way was necessary. The encounter between Agent Enk and Defendant was conversational, and the three agents never displayed or pointed a firearm or made any threats or promises.

Agent Enk then called his supervisor and requested that the remainder of the search warrant team travel to the scene. Agent Enk again informed Defendant that he was not under arrest. When Agent Enk stated that he would like to interview Defendant and would answer any of Defendant's questions, Defendant agreed to be interviewed. Agent Enk then advised Defendant of his *Miranda* rights orally, from memory, and without a written waiver, per his usual practice. After providing the *Miranda* advisement, witnessed by Agent Woods, Agent Enk asked Defendant if he understood those rights. Defendant replied yes. By that time, another agent informed Agent Enk that the remainder of the team had secured the location and that only one other individual had been located, Lynne Clow. When Agent Enk asked Defendant if he had firearms stored in places other than the gun store, Defendant responded that he did, including in three safes in his garage. Further, Defendant stated that he would be willing to assist law enforcement in opening the safes.

A few minutes after 10:00 a.m., Agent Enk escorted Defendant, who was still handcuffed, to the front passenger seat of the Expedition to conduct the interview. To make Defendant more comfortable and to assist him in getting into the front passenger seat, Agent Enk moved Defendant's

3    - OPINION AND ORDER

handcuffs to the front of his body. ATF Industry Operations Investigator (IOI) Caleb Rushing entered the Expedition and sat in the back seat behind the driver's seat, while Agent Enk sat in the driver's seat. When Agent Enk asked Defendant if he wanted anything to drink, Defendant declined. Agent Enk then turned on the air conditioning as it was a warm morning.

When Agent Enk, IOI Rushing, and Defendant were all settled in the vehicle, Agent Enk again explained that he had a federal search warrant, showed Defendant a copy of the warrant, read it aloud to him and explained the alleged charges. For a third time, Agent Enk told Defendant that he was not under arrest and further stated that Defendant did not have to agree to be interviewed. In response, Defendant stated that he did not mind being interviewed and was willing to cooperate. Agent Enk then explained that it was imperative that Defendant answer the questions truthfully. Defendant stated that he understood. Thereafter, Defendant proceeded to admit, among other things, that he had "fuc\*\*d up," sold guns to a convicted felon, and had falsely listed information in his A & D Books and on an ATF Form 4473.

The duration of Defendant's interview inside the Expedition lasted approximately one hour. The tenor of the interview was conversational; no threats or promises were made and the agents did not display or point firearms. Agent Enk did not keep his hand on his firearm. Instead, both of Agent Enk's hands were primarily used to take notes during the interview. Throughout the interview, Defendant never asked for anything or expressed concerns regarding his own or his wife's physical, emotional, or psychological well-being. During the majority of Defendant's interview, Lynne Clow was within eyesight of the Expedition's occupants.

Upon completion of Defendant's interview in the Expedition, Defendant unlocked three gun safes for Agent Enk. Defendant was then escorted to his residence where he was provided a soda to

drink and seated on a couch in the living room next to Lynne Clow. Agent Enk informed Defendant and Lynne Clow that they could choose to leave the residence while the agents were completing the execution of the warrant. However, Defendant and Lynne Clow chose to stay. When Agent Enk asked if either of them needed anything, they both said that they did not. While the search continued throughout the day, Agent Enk checked on Defendant and Lynne Clow approximately every 15 minutes to ensure that they were comfortable and to see if they needed to use the bathroom or wanted something to eat or drink.

At some point, Defendant asked if he could call an attorney in Bend, Oregon, and he was allowed to do so. When Defendant was unable to reach the attorney using his own phone, Agent Enk loaned his cell phone to Defendant to make the call. Based on Defendant's request to call an attorney, Defendant was asked no further investigatory questions. At the conclusion of searching the main residence, agents removed the handcuffs from Defendant and Lynne Clow, and allowed them to freely walk about the residence.

At approximately 5:30 p.m., Agent Enk informed Defendant that the search was complete.

## DISCUSSION

On December 12, 2012, the government filed an indictment charging Defendant with firearms offenses. On January 11, 2016, Defendant filed the instant motion to suppress statements. In his motion, Defendant argues that he was in custody when he was questioned by Agent Enk and IOI Rushing in the Expedition and allegedly confronted with evidence of guilt. Further, Defendant contends that the *Miranda* warnings provided were not legally sufficient and the resulting statements he made were involuntary. Consequently, Defendant moves to suppress the August 22, 2012 statements and prevent their admission at trial.

5    - OPINION AND ORDER

## 1. DEFENDANT WAS "IN CUSTODY" FOR PURPOSES OF *MIRANDA*.

Even though ATF Agent Enk repeatedly informed Defendant that he was not under arrest, I find that Defendant was "in custody" for purposes of *Miranda* based on the totality of the circumstances.

Custodial interrogation has long been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). When determining whether a suspect is in "custody" for purposes of *Miranda*, the court must take into account all of the circumstances surrounding the questioning. "[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). The test is entirely objective. Whether a person is in custody depends on the objective circumstances of the interrogation rather than on the subjective view of either party. *Stansbury v. California*, 511 U.S. 318, 323 (1994). Where no formal arrest takes place, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

Based on the facts of the case, Defendant was "in custody" for purposes of *Miranda* based on all of the circumstances surrounding the questioning. First, after Agent Enk stated that he would like to interview Defendant, Agent Enk advised Defendant of his *Miranda* rights. Even though Agent Enk informed Defendant that he was not under arrest, Agent Enk's advisement indicated that Defendant was in custody, because *Miranda* warnings are required only for custodial interrogations. Second, Defendant was handcuffed. Even though the handcuffs were placed in the front of Defendant's body to make him more comfortable, this is a "restraint on freedom of movement" of

a degree associated with a formal arrest. Third, the interview lasted approximately one hour. The length of time alone does not necessarily mean that Defendant was in custody. However, an hour-long interview while in handcuffs would likely lead a reasonable person to perceive that he is in custody.

Despite Agent Enk's recollection that no threats or promises were made, no firearms were pointed, Defendant was offered a beverage, and the Expedition was air-conditioned to ensure a comfortable environment, his subjective view is irrelevant. Hence, a reasonable man in Defendant's position would have understood that he was "in custody" for purposes of *Miranda* based on the totality of the circumstances.

### 2. DEFENDANT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED HIS *MIRANDA* RIGHTS.

Agent Enk provided a sufficient oral *Miranda* advisement and Defendant voluntarily waived those rights to render his statements admissible.

The basic rules regarding the waiver of a suspect's *Miranda* rights are well established. *Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. Critically, however, a suspect can waive these rights. To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary. *Maryland v. Shatzer*, 559 U.S. 98, 103-04 (2010); *see Miranda*, 384 U.S. at 475.

In the instant case, after Defendant agreed to be interviewed, Agent Enk advised Defendant of his *Miranda* rights—orally, from memory, and without a written waiver. This is Agent Enk's

7    - OPINION AND ORDER

usual practice of advising. Agent Enk does not recall exactly what words he used when he advised Defendant of his *Miranda* rights. However, Agent Enk has been an ATF Agent since 2005 and has issued *Miranda* rights to dozens of people. Accordingly, Agent Enk's habitual *Miranda* advisement includes the general rights of remaining silent, having an attorney present during any questioning, and being able to stop answering questions at any time. ATF Agent Aaron Woods witnessed Agent Enk provide Defendant the *Miranda* advisement. Here, based on the facts of Agent Enk's advisement in conjunction with Agent Woods' observation, I find that Agent Enk sufficiently advised Defendant of his *Miranda* rights prior to questioning by informing Defendant of both his right to remain silent and his right to the presence of an attorney.

After the advisement, Agent Enk asked Defendant if he understood his rights. Defendant said yes. Defendant also stated that he did not mind being interviewed and was willing to cooperate. After Defendant was escorted to his residence, Defendant asked Agent Enk if he could call his attorney in Bend, Oregon. Defendant was permitted to call his attorney, and based on his request, no further investigatory questions were asked. Agent Enk's cessation of investigatory questioning after Defendant requested an attorney further supports the finding that Defendant waived his *Miranda* rights. Thus, Defendant's verbal confirmation that he understood his *Miranda* rights and his willingness to be interviewed establish that Defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights prior to the interview in the Expedition.

### 3. DEFENDANT'S STATEMENTS WERE VOLUNTARY.

During his interview with Agent Enk, Defendant's statements were voluntarily made based on the circumstances surrounding the questioning.

"Voluntary confessions are not merely 'a proper element in law enforcement,' they are an 'unmitigated good,' 'essential to society's compelling interest in finding, convicting, and punishing those who violate the law.'" *Maryland v. Shatzer*, 559 U.S. 98, 108 (2010). A confession or admission must be voluntary to be admissible. The prosecution must prove voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). To determine the voluntariness of a confession, courts examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000).

Based on the preponderance of the evidence standard, the government sufficiently proved that Defendant's statements were voluntary. First, neither Agent Enk nor IOI Rushing made any threats or promises toward Defendant. During his testimony, Defendant claimed that Agent Enk's "demeanor" led him to believe that he would be killed if he failed to answer the questions the way Agent Enk "wanted." Also, Defendant testified that Agent Enk told him that he would come back and "kill" him. However, Defendant later admitted that Agent Enk did not actually threaten to kill him, but instead "implied" it. Overall, despite Defendant's testimony that he felt obliged to answer Agent Enk's questions based on his fear of being killed, Defendant failed to identify any specific conduct by the agents to corroborate his fear.

Second, the agents did not display or point firearms at Defendant. Defendant claimed that he was "acutely aware" that Agent Enk had a firearm readily available to him on his person based on his experience with concealed weapon carry. However, Agent Enk took copious hand-written notes during Defendant's confession. *See* Gov't Ex. 6. Thus, it is unlikely that Agent Enk had his hands placed on his firearm throughout the interview in a threatening manner.

9     - OPINION AND ORDER

Third, during the interview, Defendant asked for nothing and expressed no concerns about his or Lynne Clow's physical, emotional, or psychological well-being. Defendant testified that he provided "false" answers because he was worried that Lynne Clow was being beaten and his dogs were being shot. However, when Lynne Clow was escorted to the patio for an interview, Defendant admitted that he observed her return to the front of the house and sit in the shade after ten minutes. He also testified that Lynne Clow was provided something to drink. In fact, Lynne Clow was within eyesight of the agents and Defendant in the Expedition during most of his interview. Consequently, Defendant's actions throughout the interview contradict his testimony that he was worried about his wife and answered questions involuntarily as a result.

Fourth, during a September 12, 2012 phone call between Defendant and Agent Enk, Defendant failed to complain about his treatment when he was interviewed, his wife's treatment, any use of firearms against him, or threats that Agent Enk had made. Instead, Defendant complained about the mishandling of the firearms that were seized during execution of the warrant. Defendant's focus on matters besides the alleged mistreatment of and threats to both him and his wife discredit his claims that he feared for his life.

Lastly, Defendant's familiarity with ATF agents weakens his claim that his statements were involuntary. As both the manager and "consultant" at 2nd Amendment Guns, Defendant testified that he participated in a revocation hearing in 2005 as an advocate for a license holder. During the hearing, Defendant claimed that he "cross-examined" ATF's witnesses and obtained information based on the Freedom of Information Act. Accordingly, Defendant's participation in both 2nd Amendment Guns as well as his alleged familiarity interacting with ATF agents lends to Defendant's sophistication and detracts from his asserted fear of ATF agents.

Despite Defendant's claims that his fear of ATF agents rendered his statements involuntary, Defendant's testimony fails to identify any specific evidence that would lead him to have such belief. Thus, at best, Defendant's testimony demonstrates that his fear of ATF agents was self-imposed and not the result of specific instances of violence or threats by agents. Based on the totality of the circumstances, Defendant's statements were voluntary.

### 4. DEFENDANT'S STATEMENTS CAN BE USED FOR IMPEACHMENT.

The government does not intend to use Defendant's statements in its case-in-chief as substantive evidence against Defendant, but rather to impeach Defendant if he chooses to testify or otherwise present evidence inconsistent with those statements.

Statements taken in violation of *Miranda* cannot be used in the prosecution's case-in-chief as substantive evidence against the defendant. However, so long as the statements are not coerced or involuntary, statements obtained in violation of *Miranda* can be used for impeachment should the defendant take the stand and testify contrary to such statements. *United States v. Harris*, 401 U.S. 222, 222 (1971). "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Id.* at 226.

As mentioned above, Defendant's statements were neither coerced nor involuntary, but rather voluntarily provided during Agent Enk's questioning. Even if Agent Enk failed to provide a sufficient advisement of *Miranda* rights, Defendant's statements are still admissible under *Harris*. Since *Miranda* cannot be "perverted into a license to use perjury by way of defense," Defendant's voluntary statements should be admissible to impeach Defendant at trial if he chooses to testify or present evidence arguably conflicting with those statements.

## CONCLUSION

Defendant's August 22, 2012 statements were voluntary and admissible. Accordingly, Defendant's Motion to Suppress (doc. 47) is DENIED.

IT IS SO ORDERED.

Dated this 29th day of March, 2016.

/s/ Ann Aiken
Ann Aiken
United States District Judge

12    - OPINION AND ORDER